# IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| **AJSHAY JAMES** | § | |
| *Plaintiff,* | § | |
| | § | |
| **V.** | § | **NO. 4:19-cv-03485** |
| | § | **(JURY REQUESTED)** |
| **AZELIA WALKER-SMITH, et al.** | § | |
| *Defendants.* | | |

## PLAINTIFF'S FIRST AMENDED PETITION

This civil rights complaint, brought under 42 U.S.C. § 1983, arises from the actions – and failures to act – of the Texas Department of Family & Protective Services ("TDFPS" or "CPS") named employees and investigators, sued in their individual capacity, and from the actions and failures to act – of the Texas Children's Hospital ("TCH" ) named social worker(s), doctors, staff, all who were directly involved and participated in the wrongful removal and retention of the child without an investigation, warrant or court order through an improper investigation; by the use of false and misleading statements forming the basis of the removal; by allowing and participating in improper supervision and oversight; and then refusing to place the child with James, without probable cause. The actions of the named Defendants, that violated James's constitutional rights, start on, or about September 6, 2017 and continued until now. James is seeking damages against Defendants for the commission of acts, or the failures to act, under color of State Law, that deprived James' of her parental rights as guaranteed under the Fourteenth Amendment to the United States Constitution secured by law of the Constitution of the United States.

## JURISDICTION AND VENUE

Because this action is brought under 42. U.S.C. § 1983, this Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3).

Venue is proper in this judicial district, under 28 U.S.C. § 1391(b), because a substantial portion of the events, or omissions, giving rise to Plaintiffs' claims occurred in the Southern District of Texas, Houston Division, in that:

Plaintiff, at all relevant times, resided in Harris County, Texas; and Defendants are found, or are employed, or at the time of the incidents giving rise to this suit were so employed, in the Southern District of Texas, Houston Division.

## PARTIES

Defendant, Ericka Davis, was at the time of her unconstitutional acts in this case, an employee of TDFPS. She is being sued by Plaintiff in her individual capacity.

Defendant, Candace J. Broussard-White, was named in James' original complaint, but is now dismissed from this suit.

Defendant, Sherry Gomez, was named in James' original complaint, but is now dismissed from this suit.

Defendant, Monica Sanders, was named in James' original complaint, but is now dismissed from this suit.

Defendant, Marilyn Polk, was named in James' original complaint, but is now dismissed from this suit.

Defendant, Shelly Martin, was at the time of her unconstitutional acts in this case, an employee of TDFPS. She is being sued by Plaintiff in her individual capacity.

Defendant Azelia Walker-Smith, was at the time of her unconstitutional acts in this case, an employee of TDFPS. She is being sued by Plaintiff in her individual capacity.

Defendant Amy Lynn Small, was at the time of her unconstitutional acts in this case, an employee of TCH. She is being sued by Plaintiff in her individual capacity.

Defendant Cara G. Lye, was at the time of her unconstitutional acts in this case, a doctor providing medical services to TCH. She is being sued by Plaintiff in her individual capacity.

Defendant Jeanine Graf, was at the time of her unconstitutional acts in this case, a medical director of working for TCH. She is being sued by Plaintiff in her individual capacity.

Defendant Katie C. Evans, was at the time of her unconstitutional acts in this case, an employee of TCH. She is being sued by Plaintiffs in her individual capacity.

Defendant Ricardo Quinones, was named in James' original complaint, but is now dismissed from this suit.

Defendant Texas Children's Hospital ("TCH") is the hospital that provided medical services to the child.

Defendant John Robertson, was at the time of his unconstitutional acts in this case, a doctor providing medical services to TCH. He is being sued by Plaintiff in his individual capacity.

Defendant Marcella Donaruma-Kwoh, was at the time of her unconstitutional acts in this case, a doctor providing medical services to TCH. She is being sued by Plaintiff in her individual capacity.

Defendant Penelope T. Louis, was at the time of her unconstitutional acts in this case, a doctor providing medical services to TCH. She is being sued by Plaintiff in her individual capacity.

Defendant Jennifer Stansbury, was at the time of her unconstitutional acts in this case, an employee of TCH. She is being sued by Plaintiff in her individual capacity.

Defendant, Trevor Woodruff, is currently the Acting Commissioner of the Texas Department of Family and Protective Services (thereafter referred to as "TDFPS"). Pursuant to the Texas Government Code Title 4, Chapter 531, he is responsible for administering properly and efficiently all DFPS services programs. Trevor Woodruff is being sued in his official capacity as Acting Commissioner of TDFPS

## STATEMENT OF FACTS

1. **August 20, 2016 to August 28, 2017:   The child is treated under Dr. Louis at TCH**

The child was born on September 9, 2015 at Texas Woman's Hospital.   At the time of birth, the child weighed only 359 grams (13 oz) and was classified as a "micro-preemie." When the child was born, she was the size of a coke can.  The child spent the first 16 weeks in an incubator and connected to a machine that pumped oxygen in and out of her small but developing lungs. It took the child approximately 5-months to be discharged from Texas Woman's Hospital.

After discharge, the child was treated by Dr. Maria Russell, who had a pediatric clinic at Texas Woman's Hospital, but she was not equipped to provide the kind of care that the child needed. Eventually, on or about August 2016, the child was placed under the care of Dr. Penelope T. Louis with TCH: Main Campus. Dr. Louis became the child's primary doctor and continued in that position until shortly before the events giving rise to the case. Dr. Louis, thus, provided primary care to the child from approximately August 20, 2016 to August 28, 2017 at the TCH: Main Campus and until some point thereafter.

Dr. Louis was an Associate Professor of Pediatrics at Baylor College of Medicine, Chief of the Special Needs Primary Care Clinic (formerly the Complex Care Clinic) and Chief of the child Protective Health Clinic at TCH. Dr. Louis is listed as a contributor to the book titled, "A Practical Guide to the Evaluation of Child Abuse and Neglect."[1]

According to that book, healthcare professionals are obligated in all jurisdictions to comply with the law. Yet, despite this legal duty, and being Chief of the child Protective Health Clinic at TCH, Dr. Louis never reported James or took any action to report allegation of child abuse all throughout the time period that the child was being treated by

---

[1] Texas Children's Hospital is a recognized hospital and academic health center with expertise in pediatric health care with a demonstrated commitment to developing advanced programs and centers of excellence relating to the abuse and neglect of children. One such program includes Child Abuse Pediatrics (or "CAP") at TCH. In 2010, CAP was awarded a MEDCARES (Medical Child Abuse Resource and Education System) grant from the Department of Health and Human Services. MEDCARES is focused on improving the assessment, evaluation and treatment of child abuse and neglect. CAP further conducts an educational program, called SCAN (Suspect Child Abuse and Neglect) for professionals which focuses upon: (1) Identifying signs and symptoms of child maltreatment; (2) Biomechanics of various injuries and how they can indicate underlying abuse; (3) Importance of family history; (4) Conditions that mimic abuse; (5) How to document injury findings; and (6) Local resources for medical consultation or service referrals.

Dr. Louis from August 2016 to August 28, 2017. This time period spans approximately one year.[2]

In reviewing the child's medical records, they indicate that the child Abuse Pediatrics[3] (or "CAP") Team referred allegations of child abuse on or about August 21, 2016 to Dr. Louis. But, rather, than reporting James at that time Dr. Louis determined that James "is over reporting secondary to her own anxiety and lack of knowledge regarding normal ranges for patient outside of neonatal range." James does admit that she was extremely anxious and was hyper-vigilant about the child's health. This does not show, as Dr. Louis understood, that James was abusing the child or that the child was at risk of death because James was suffering from munchausen syndrome by proxy ("MSBP") for which she has never been diagnosed.

Rather than reporting James, however, Dr. Louis approved or ratified all the diagnosis and treatment provided to the child throughout this one-year period. This included but is not limited to:

- Trachobroncholmalacia
- Chronic Pulmonary Insufficiency following surgery
- Gastro-esophageal reflux disease without esophagitis
- Dependence on other enabling machines and devices
- Bradycardia, unspecified
- Developmental Delay
- Dysphlagia, oral phase

---

[2] In the book (where Dr. Penelope Louis is listed as a contributing author), "A Practical Guide to the Evaluation of Child Abuse and Neglect," page 27 indicates that a medical evaluation of child abuse includes: (1) a history, (2) physical examination, (3) indicated laboratory and diagnostic studies, and (4) observation of the care-giver-child interaction." James was never given any observation of the care-giver-child interaction.

[3] CAP at Texas Children's Hospital employs an integrated and multidisciplinary approach to minimize the impact of child abuse and neglect on children of all ages in our community through prevention, patient care and outreach.

- Seizures
- Other Disease of the Larynx
- Sleep Apnea, Unspecified
- Encephalopathy, unspecified
- Diabetes Insipidus
- Physical anomaly
- Unspecified combined systolic (congestive) and diastolic

## **Prescriptions**

- ProAir
- Flonase
- Prevacid
- Acetametaphine
- Carafate
- DDAVP
- Desmopressin
- Ibuprofen
- Lansoprazole
- LevETRAcetam
- Ondasteron
- Pediasure Grow and Gain
- Poly-Vi-Sol with iron
- Albuterol
- diphenhydramine
- Fluticasone INH MDI HFA
- Triamcinolone acetonide TOP OINT
- Mupirocin

## **Treatments and Services**

- Private Duty Nursing and Skilled Nursing
- Personal Care Attendant
- Physical Therapy
- Occupational Therapy
- Speech Theraphy
- Feeding Theraphy

- AFOs
- SPOs
- Medical Walker
- Cranial Orthotic
- continuous oxygen support
- surgery for subglottic cysts
- CPAP/BIPAP
- Apnea monitor
- Pulsometer
- Nebulizer
- Orders for durable medical equipment including, oxygen concentrator, tanks and respiratory support supplies

Further need for home health care, durable medical equipment and in-home care support were authorized, re-authorized, and continued as ordered by Penelope Louis, MD for the child's plan of care.

### 2.  August 27, 2017:  Hurricane Harvey

Hurricane Harvey hit Houston.  James' home flooded.   James and the child were rescued. On August 27, 2017, James requested that The child be taken to TCH: Main Campus.  Through Dr. Louis, TCH: Main Campus had provided a substantial amount of medical care to the child and TCH personnel had access to The child's medical records which would be instrumental in providing proper care to her.

Unfortunately, TCH: Main Campus had also experienced some degree of flooding and James understood that TCH: Main Campus was not taking any new patients during this time.   Instead, James and the child were taken to Pearland Medical Center.  After staying at Pearland Medical Center for one night, the hospital, lacking complex pediatric

care, transferred James and the child to TCH: West Campus Houston. Although The child had not received treatment from TCH: West Campus Houston before, TCH: West Campus Houston was chosen on the basis that the hospital would have access to all of The child's medical records and any treatment provided to The child at TCH: West Houston would be based upon the medical history contained within. James did not desire to transfer the child's treatment to different facilities but believed that consistency of treatment was always in the child's best interest.

### 3. August 28, 2017: First Visit to TCH: West Campus Houston

On August 28, 2017, James and the child checked into TCH: West Campus Houston and treatment was administered by a number of doctors. The child's medical records from this time period indicate that Dr. Robertson, as the child's primary pulmonologist, believed that another sleep study would be beneficial to determine whether the child still needed a BIPAP machine and night oxygen. James agreed with this assessment, and a sleep study was conducted. The sleep study determined that the child did not need the BiPAP machine or oxygen.

Rather than react negatively, as one might expect from a mother allegedly diagnosed with munchhausen syndrome by proxy ("MSBP"), James indicated that she was delighted. The child's medical records specifically state:

| Subjective |
| --- |

No new complaints or events overnight, patient remained afebrile. Mother at bedside.[MC1.1]

After telling mother results of sleep study she stated, "We prayed for this... Very happy to hear the good news... She is excited to only have to carry one purse around and go to the zoo without a machine..."[MC1.3]

This is further confirmed by the note on 9/6/2017 by Amy Small stating that" pt did not have oxygen on or any with her" when returned to the hospital on September 6, 2017.

### 4. September 5, 2017: First Discharge from TCH

On September 5, 2017, the child was discharged from TCH: West Houston in the care of her mother, James. As indicated on the child's medical records, TCH: West Campus Houston would not have discharged James if James had failed to demonstrate the skills and knowledge for continuing care needs.

At home on the evening of September 5, 2017, James followed the doctor's orders and did not place the child back on oxygen or use the BiPAP machine. This would be James' last night with the child until December 25, 2019.

### 5. September 5, 2017: Referral to CPS

While one hand was discharging James and the child, the other was moving to separate them. On September 5, 2017, Jennifer Stansbury, social worker at TCH: Main Campus, made a referral to CPS regarding "increased concerns for medical child abuse." Although the child's medical records do not provide any further details about what Jennifer Stansbury reported to CPS, the affidavit of Ericka Davis contains details regarding Stansbury's referral as follows:

1. Stansbury indicated to CPS that the child receives 150 hours a week from an "unknown health provider." The "unknown health provider" is Nestar. Nestar provided skilled nursing care for the child at home. This is clearly documented in the child's medical records as ordered by Dr. Louis. Nestar regularly communicated with Dr. Louis who updated her on the need for continued care.

Furthermore, Dr. Louis regularly issued orders for Nestar to provide care for The child.

2. Stansbury indicated to CPS that "James previously had [the child] on 4 liters of oxygen a day although medical staff advises she does not need oxygen." Stansbury failed to inform CPS that by the time that the referral was made – on September 5, 2017 – the child was no longer receiving any oxygen as a result of a wean and the prior sleep study conducted before the first discharge. Furthermore, the child was never ordered to be placed on 4 liters of oxygen a day. The child had a previous order for continuous oxygen up to 3LPM- 4LMP (liters per minute) and for it to be increased and used for strenuous activity, as needed. This could have been easily verified by speaking with Dr. Louis or consulting the records. Obviously, this was not done.

3. Stansbury indicated that "James previously had [the child] in a helmet for 23 hours a day although she did not require it." First, The child had been discharged for wearing a helmet on February 27,2017. Second, The child was prescribed a helmet by the TCH: Bluebird Clinic and diagnosed with plagiocephaly. The helmet was custom made by Hangar Clinic via order from TCH: Bluebird Clinic. The child was ordered to wear the helmet 23 hours a day by the helmet specialist. The idea that James required The child to wear a helmet that she did not need is absurd, as an objective medical determinization was made by the TCH: Bluebird Clinic that The child needed a helmet to allow her cranium to form correctly. This is common conduction for a "micro-preemie."

4. Stansbury indicated that "medical staff do not have concerns of The child having seizures or lung disease." Regarding the lung disease, even after The child was discharged on September 16, 2017, after CPS was ordered temporary managing conservator, Dr. Graf still continued to diagnose The child with tracheobronchialmalacia. The Genetic and Rase Diseases Information Center, published by the National Center for Advancing Translational Sciences, indicates that "tracheobronchialmalacia" is a lung disease.

5. Stansbury indicated that James had arrived to the hospital "completely dry and in designer wear," seeming to question her story about escaping her flooded home during the hurricane. For the record, James reports arriving to the hospital wearing clothes that had been pulled from a lost-and-found bin at the first hospital she was taken to following her rescue. Further, Jennifer Stansbury has never met or interacted with James.

6. Rather than inform James that Stansbury had made a referral to CPS, Stansbury indicated, in bold letters, "please do not inform the family." This was done with an obvious intent to keep James in the dark about possible allegations of medical child abuse and to keep her off guard so that Defendants could begin the process of removing the child from James. At no point in time, prior to a receipt of notice of removal on September 14, 2017, did James ever receive notice that she was under suspicion for alleged medical child abuse.

7. **September 6, 2017: Meeting**

On September 6, 2017, a conference was held between the Defendants, including but not limited to, Dr. Graf, Dr. Donaruma, Ericka Davis and Shelly Martin. This conference is critical to the facts of this case, because it was at that conference that the Defendants formed a meeting of the minds and formulated a plan to remove the child from James.

Although James was not at that meeting, as she had no knowledge that she was under suspicion of child abuse before she was served with a notice of removal on September 14, 2017, what occurred at that meeting can be determined from a review of The child's medical records.

The September 6, 2017 meeting was called by Dr. Graf. As Dr. Graf was the Chief Medical Director for TCH, Dr. Graff was the doctor responsible for creating policies relating to all medical aspects of TCH. The child's medical records indicate that Dr. Graff, in formulating her decision to call the meeting, indicated that she had spoken with Dr. Louis and Dr. Robertson and those doctors indicated "their care decisions have been initiated based on parental history and not witnessed events or workup." This statement exposes the fraud committed in this case because it indicates that none of the care decisions made by Dr. Louis or Dr. Roberston (or Dr. Rosen) where made on the basis of any objective examination or testing and only allegedly upon James' observations. The child's medical records contradict that assertion, because they are repeat with multiple medical examinations, observations, and testing. It would be impossible for these doctors to make diagnosis of the child's conditions without conducting the proper examinations or testing. The above is notated in the child's medical records as follows:

*The medical director spoke with her primary complex care clinic MD and her primary pulmonologist regarding her care needs. Both physicians expressed that their care decisions have been initiated based on parental history and not witnessed events[LB1.1] or workup.[LB1.2] Given these concerns and the hospital events, a CPS report was made on Tuesday 9/5[LB1.1] for concerns of pediatric falsification. CPS had arranged a meeting with her providers scheduled for 9/6/17[LB1.1] to determine whether therapeutic separation would be warranted.[LB1.2]*

In direct contrast with Dr Graf's assessment above, each one of the child's medical conditions were supported with previous examination and testing. A review of the child's medical file indicates same. For example, Dr. Graf and Dr. Donaruma testified in Court regarding their opinion of James' mental health and the child as a victim of medical child abuse that they believed, but that testimony is not challenged in this complaint. The child's medical records show that Dr. Graf formulated this theory on or about September 6, 2017 and likely conveyed that theory to CPS and the social worker Defendants. Later, Dr. Donaruma, who claims to be a Child Abuse Pediatrician, testified at the 9/15/2017 removal hearing, along with Dr. Graf. Dr. Donaruma was little more than an expert and had no personal knowledge of any of the facts of this case. Dr. Donaruma is implicated in this because she participated in the conspiracy to deprive James of her parental rights by agreeing with Dr. Graf's fraudulent assessment of James' mental health.

1. DIABETES INSIPIDUS: Before testifying in Court on September 15, 2017, Dr. Graf and Dr. Donaruma agreed, outside of Court, that Dr. Georges Jeha, had diagnosed The child with diabetes insipidus based only on observations that James' had falsely reported that The child was having as many as 20 wet diapers a day, thus, suggesting that James had pushed for the diagnosis and treatment. Yet, according to The child's medical records, however, Dr. Simon Kayyal, a Texas

Children's neurologist, had made the initial referral to Dr. Jeha after an MRI showed a potential problem with The child's pituitary gland. During the appointment, Dr. Jeha instigated the diaper question, asking James, as well as the child's home health nurse from Nestar, LLC how many wet diapers the girl had been having. Dr. Jeha cited the MRI, along with the diaper estimate, in his decision to prescribe medication, indicating later that the child's "imaging findings as well as her clinical picture ... are consistent with central diabetes insipidus." Furthermore, the home health nurse from Nestar, who attended the meeting, helped calculate the maximum number of diapers that the child used in a day. The home health nurse changed majority of these diapers every day.

2. BREATHING ISSUES: Dr. Graf and Dr. Donaruma agreed, outside of Court, that James' concerns about breathing issues were never demonstrated through objective testing, nor were they ever observed by anyone other than James. Yet, according to The child's medical records, Dr. Robertson diagnosed The child with moderate obstructive sleep apnea as based on the results of an in-hospital sleep study in May, 2016. The clinical findings were not normal and supported the diagnosis. Furthermore, Dr. Graf and Dr. Donaruma also agreed that no medical professionals had witnessed The child suffer from breathing episodes, yet this is not supported in The child's medical records.[4] Nestar, the private home nursing company tasked with

_____

[4] For example,

A TCH therapist noted on 6/15/16 that during PT, The child had "episodes of desaturations to 78% while at rest."

caring for The child 120 hours a week, as ordered by Dr. Louis, -- as ordered by TCH -- called the hospital on 10/19/16 to discuss the "patient's desaturations and apnea episodes." The child's primary physician, Penelope Louis, replied by instructing that "nurses have to be sure and put on BiPAP when sleeping."

3. BREATHING ISSUES: In her letter to CPS on September 8, 2017, Dr. Donaruma wrote, "Only one true medical condition that requires therapy has been verified. The child has language delay, both expressive and receptive." This is false. According the discharge paperwork, doctors affirmed that The child was diagnosed with tracheobronchomalacia. The child was prescribed an inhaler and continued to receive twice-daily nebulizer treatments throughout the hospital stay.

4. EATING ISSUES: Dr. Graf and Dr. Donaruma agreed, outside of Court, that The child had no eating difficulties during the separation and that only James had ever reported that The child had difficulty eating. Yet, The child's medical records indicate that during the separation trial, Laura Loveless diagnosed The child with dysphagia and recommended "outpatient feeding therapy upon discharge." In court,

---

Again on 8/17/16, "(The child) presents today with O2 saturations anywhere from 48% to 100% oxygen, recovering within 1 minute during most desaturations (primarily into the 60s and 70s)."

On 1/20/17: "The child presents with increased desaturations this session with O2 ranging 72-100%, each desaturation returning >90% within 30 seconds. One episode of bradycardia this session."

On 2/17/17: "Pt with multiple desaturations throughout session today with 3 occasions of desaturating into the 60's. Pt was on 4L of O2 throughout treatment session today."

On 3/3/17: "The child presenting with increased fatigue and desaturations to 73% this session requiring frequent rest breaks for O2 to return >95%."

Dr. Graf appeared to minimize this concern, saying only that "They said she's a little bit slow with her eating."

5. SEIZURES: At the September 2017 court hearing, Dr. Donaruma testified that The child had been receiving anti-seizure medication based only on James's reports of shaking seizures and staring spells. And although there's no medical test that can disprove that a child has suffered seizures in the past, Donaruma said the fact that The child had not suffered any since being weaned from the medication was evidence that James had been lying. But medical records show that James initially resisted when a TCH neurologist recommended putting The child on anti-seizure medication. Records also indicate that at least some of the reports of seizures coincided with times when The child was suffering high fevers. And there is evidence in the medical records that other people witnessed the staring episodes that James believed may have been seizures, directly contradicting Dr. Donaruma's testimony. In July 2016, for example, after James described a serious breathing episode and staring spell to a TCH doctor, the doctor wrote: "Home health nurse witnessed this episode as well and attests to mom's description." Another note from that same week indicates that it was actually the home nurse who first "noticed some twitching movements of all extremities," according to the TCH medical record. The nurse "[b]elieved patient was acting playfully until she noticed desats into the 40's," the note said, indicating The child was suffering a serious breathing episode.[5]

---

[5] According to Nestar, the home nurses also indicated:

9/16/2017 " while on carpet SN  noted pt to have staring seizure characterized by a blank stare that lasted  10 seconds"

Based upon the discussions that occurred at the September 6, 2017 meeting, the Defendants began the process of conspiring to remove the child from James without a court order and lacking exigent circumstances. The removal plan agreed to at that meeting is summarized as follows:

1. [PHASE 1] CPS caseworkers, Ericka Davis and Shelly Martin, to coerce James to return the child back to TCH: West Campus, as Dr. Choy (not a defendant in this case) at TCH: West Campus had already discharged her;

2. [PHASE 2] Separate James from the child without legal justification. Stall James and forbid her from seeing the child so that CPS could have enough time to obtain a removal after receiving approval from CPS supervisors.

3. [PHASE 3] Document in the medical records, as ordered by Dr. Graf, that a separation test needed to be performed on the child to determine whether she was a victim of child abuse. In reality, this separation test was a fraud to show TCH personnel why they were keeping the child away from her mother.

6. **September 6, 2017: Home**

In accordance with the plan formulated at the September 6, 2017 meeting, Ericka Davis and Shelly Martin arrived at the child's and James' temporary residence without any prior warning.

---

09/21/2017 "SN observed pt having seizure activities that lasted for 15 seconds, characterized by fixed posture and blank stare, patient airway maintained O2 increased to 4LPM close monitoring done to prevent injury, patient had large amount of urine filled the diaper. Post seizure assessment done"

Ericka Davis coerced James to take the child back to TCH: West Campus. James was told that she needed to take the child back to TCH: West Campus, otherwise, CPS would come back with an order removing The child. This was a material misrepresentation because CPS was aware that they did not have any sufficient basis on September 6, 2017 to remove the child. CPS later tried to obtain removal on September 8, 2017, but failed. Ericka Davis and Shelly Martin also indicated that "things were going to be worse." Davis and Martin indicated that the "doctor," without reference to any specific doctor, indicated that The child was receiving medication that she did not need. James asked what medication, and Davis and Martin responded that the medication was "desmopressin." James pointed to a specific bottle and indicated that the medication was prescribed by Dr. Georges S. Jeha, The child's Pediatric Endocrinologist. The September 5, 2017 discharge paperwork from TCH: West Campus also indicated that James was to continue administering the desmopressin. Dr. Choy, The child's September 5, 2017 discharging physician even gave James a new prescription to refill the medicine.

Dr. Simon Kayyal, The child's Pediatric Neurologist, referred The child to Dr. Jeha on the basis that a scan revealed that The child missing a part of the pituitary gland. Dr. Kayyal further indicated that the child cognitive development would be inhibited. In January 2017, Dr. Jeha diagnosed the child with diabetes, insipidus, and prescribed desmopressin.

## 7. September 7, 2017: Safety Plan and Medical Authorizations

On September 7, 2017, Azalea Smith informed Amy Small that CPS does not have a signed safety plan from James, which means there is no legal basis for the separation.

Although James did sign a safety plan on September 7, 2017, the document was not explained to James. Ericka Davis indicated that James was signing only to acknowledge receipt, not agree to the plan.

On September 7, 2017, James signed an authorization for CPS to provide access to the child's medical records. This means that CPS could now review The child's medical file and determine whether The child's treatment was based only upon James' observations, as indicated by Dr. Graf. Even the most cursory review of that file would have determined that The child's medical conditions were based upon objective examinations and tests.

**8. September 6 – September 8, 2017**

On September 5, 2017, Dr. Graf indicated that the therapeutic separation "will be both diagnostic and therapeutic in making the diagnosis of medical abuse." According to Dr. Donaruma, on September 6, 2017, the trial separation had begun and ended on September 8, 2017 with a diagnoses that the child was the victim of medical abuse. However, on September 6, 2017, before the trial separation had concluded, Dr. Graff noted on the child's medical records that a number of conditions were mysteriously "resolved," as indicated:

| Problem List (continued) | | |
|---|---|---|
| | Noted | Resolved |
| Sent to tcher by Dr Robertson - recommended head ct, 24 hr eeg, 24 hr holter and sleep study, also needs VPS | | |
| **Sleep apnea**  Priority : High  Class : Chronic | 3/30/2016 by Heyden, Lisa D, MD | 9/6/2017 by Graf, Jeanine M, MD |
| **Heart murmur**  Overview Signed 4/7/2016: 1:10 PM by Rossell, Maria A, MD | 4/7/2016 by Rossell, Maria A, MD | 9/6/2017 by Graf, Jeanine M, MD |
| Sees cardiology. | | |
| **Dehydration** | 4/14/2016 by Chladek, Melissa S, MD | 8/28/2017 by Westry, Maria Fatima, PA-C |
| **ALTE (apparent life threatening event)** | by Patel, Ameeben, MD | 8/28/2017 by Westry, Maria Fatima, PA-C |
| **Unspecified abnormal involuntary movements** | 5/13/2016 by Ho, Dao-Albert H, MD | 8/28/2017 by Westry, Maria Fatima, PA-C |
| **Acquired plagiocephaly of right side**  Overview Signed 5/16/2016 12:36 PM by Chambers, Jennifer J, CPNP, RN | 5/16/2016 by Chambers, Jennifer J, CPNP, RN | 9/6/2017 by Graf, Jeanine M, MD |
| Followed by cranial tech | | |
| **OSA treated with BiPAP**  Overview Addendum 8/29/2017 11:56 AM by Graf, Jeanine M, MD | 5/21/2016 by Labarinas, Sonia P, MD | 9/6/2017 by Graf, Jeanine M, MD |
| Founded by pulm - Last visit states pt on CPAP | | |
| Mother reports followed by Dr. Robertson- observed over night in west ICU on 8.29 and did well on nasal cannulae; sleep study unremarkable. | | |
| **Apnea in infant** | by Chiou, Eric H, MD | 8/28/2017 by Westry, Maria Fatima, PA-C |
| **Cyanosis** | 6/9/2016 by Rissmiller, Brian J, MD | 8/28/2017 by Westry, Maria Fatima, PA-C |
| **Apnea for greater than 15 seconds** | 6/9/2016 by Rissmiller, Brian J, MD | 8/28/2017 by Westry, Maria Fatima, PA-C |
| **Development delay**  Overview Signed 6/9/2016 12:19 PM by Chambers, Jennifer J, CPNP, RN | 6/9/2016 by Chambers, Jennifer J, CPNP, RN | No |
| recs tx | | |
| **Seizure-like activity** | 7/21/2016 by Kayyal, Simon Y, MD | 9/6/2017 by Graf, Jeanine M, MD |
| **Polyuria** | 1/10/2017 by Jeha, Georges S, MD | 9/6/2017 by Graf, Jeanine M, MD |
| **Polydipsia** | 1/10/2017 by Jeha, Georges S, MD | 9/6/2017 by Graf, Jeanine M, MD |
| **Diabetes insipidus** | 1/10/2017 by Jeha, Georges S, MD | 9/6/2017 by Graf, Jeanine M, MD |
| **Snoring** | by Thomas, Kevin A | 9/6/2017 by Graf, Jeanine M, MD |
| **Obstructive sleep apnea of child** | 9/4/2017 by Glaze, Daniel G, MD | 9/6/2017 by Graf, Jeanine M, MD |
| **Munchausen's syndrome by proxy** | 9/6/2017 by Han, Yong S, MD | No |
| **High risk social situation** | 9/6/2017 by Han, Yong S, MD | No |
| **Dysphagia, oral phase** | 9/8/2017 by Loveless, Laura H, SLP | No |

On that basis, James pleads that the trial separation was fraud, because even before the study had completed, Dr. Graf moved to show that a number of the child's medical conditions had been resolved. Dr. Graf also took the child off the medications prescribed for these conditions, including the desmopressin allegedly given for the diabetes insipidus. Because James was separated from the child all during this time period, Dr. Graf never gave James any opportunity to accept or reject this treatment. This is critical to a determination of whether the child was the victim of medical child abuse as alleged.

Because James was separated from Harper all during this time period, Dr. Graf never gave James any opportunity to accept or reject this treatment. This is critical to a determination of whether James suffered from munchausen syndrome by proxy ("MSBP") in which Dr. Graf should have provided James with an opportunity to reject treatment before making a proper diagnosis. Furthermore, James had very little contact with Dr.

Graf, Dr. Graf never observed James interact with Harper for any length of time longer than approximately 10 minutes. Certainly, after the Defendants had excluded James from having any contact with Harper on September 6, 2017, Dr. Graf never provided James with any opportunity to do so.

Note from Amy Small, on September 6, 2017, indicated the plan to keep James in the dark. The note further indicates that the child had in good health, very active, and running around the hospital room after spending the night with her mother.



And keep James away from Harper without legal authority:

Mother is only allowed to call the floor once a day for an update from nursing staff. At this time it is requested that mom has no contact with pt, both verbal and/or phsyical. CPS is working with their legal team for a removal from mother, but that has not been completed at this time. Mother has been instructed to call the nurses station for updates on pt.

IF MOTHER COMES TO THE HOSPITAL, PLEASE CALL SOCIAL WORK AND SECURITY.

Amy Small, LMSW
X72550

SW will continue to follow.

Ashley Johnson further indicated that the "caregiver participates in pt's care needs" and then directly contradicts that assertion with the message below:



The representation that "CPS has custody of pt" is fraudulent. CPS did not obtain custody of the child until September 15, 2017.

### 9. September 8, 2017

On September 8, 2017, Katie Evans indicated that CPS had attempted to get a court order for emergency removal but was unsuccessful. Evans indicated that the "plan is to SLOWLY get mother to the floor and to bedside to allow social work and CPS as much time as possible to get CPS to the hospital before mother can take the patient." The child's medical records indicate:

**Goal:** Provide Support & Promote Coping
**Intervention:** Request to see Social Work
UPDATE:

CPS attempted to get a court order for emergency removal today and was unsuccessful as the CPS Attorney will not file it unless mother comes to TCH WC and attempts to take the patient.  Mother's lawyer called CPS today and advised mom is no longer willing to honor the voluntary therapeutic separation and CPS suspects mom will come to the hospital in the next couple days to try and take the patient.  Plan per CPS and TCH CAP team is as follows:
 -Patient still a no information patient (as mother has contacted media) and there is a security alert at the front desk to have security and social work called if mother presents to the hospital
 -Mother will be allowed to have contact with the patient and can sign her out AMA, we CANNOT stop her with the safety plan and have no court order to stop mother from taking the patient – plan is to SLOWLY get mother to the floor and to bedside to allow social work and CPS as much time as possible to get CPS to the hospital before mother can take the patient
 -If called that mother is on site social work will IMMEDIATELY call <u>CPS Supervisor Azaela Smith 832-454-4578</u> or CPS investigator Ericka Davis 713.494.5971 and she will send a local CPS worker to the hospital to serve mother emergency removal paperwork, CPS attorney has instructed that CPS will not serve mother paperwork for removal unless mother comes to the hospital – CPS working to get a local CPS worker that lives in Katy on standby
 - Dr. Graf, PHM, WC House Supervisor, 5W Charge Nurse, weekend SW team and Security Team all updated and aware


Katie Evans, LMSW
x 71279

The note also appears to indicate that CPS tried to obtain emergency removal on September 8, 2017, but had failed.

### 10. September 14, 2017

Azelia Walker-Smith contacted hospital social worker, Amy Small, to tell her that CPS would be allowing the child to return home with James because their investigation had determined the the child "would not be in imminent harm if returned to mother today" and because " mother has cooperated with the therapeutic separation."

Amy Small responded by indicating that if the child "is allowed to go back to her [James] then [James] has the funds to flee from the Houston area with the funds that have been donated to [James] through Go Fund Me.  [James] could find another medical provider that would again put [The child] on the medications that she does not require and/or the medical equipment that she does not require, which has been demonstrated by the therapeutic separation."

Twelve minutes later, Amy Small reported sharing this information with the TCH child protection team and a general pediatrician named Dr. Cara Lye. Within minutes, Dr. Lye added a note to The child's medical record claiming that "If she were to be discharged to mother's care she is in imminent danger and at risk of death." Eleven minutes after that note was added to TCH's record system, Amy Small reported contacting Azelia Smith and providing a copy of Lye's note. Presented with the dire warning from a doctor, CPS abruptly reversed its position, and agents served James with emergency removal papers that day.

On September 14, 2017, instead of taking the child home to James as they originally planned, Ericka Davis delivered a notice of removal paper to James. James does not sign the document.  The notice of removal is attached as **Exhibit 1**.

11. **September 15, 2017: Removal Affidavit**

On September 15, 2017, a petition in intervention was filed by CPS.  CPS requested to be appointed permanent sole managing conservator, as follows:

**13.     Permanent Conservatorship and Support of the child**

    **13.1.     Conservatorship**

        13.1.1.    Pursuant to §§153.005 and 263.404, Texas Family Code, if the child cannot safely be reunified with either parent, but may be permanently placed with a relative or other suitable person, the Department requests that the Court appoint the person as sole managing conservator of the child. If the child cannot safely be reunified with either parent or permanently placed with a relative or other suitable person, the

Original Petition in Intervention for Protection of a Child for Conservatorship in
Suit Affecting the Parent-Child Relationship
Page 6

2016-09115 / 312
September 15, 2017 (fwardlaw)

            Department requests that the Court appoint the Department as permanent sole managing conservator of the child.

            As grounds for appointment of the Department, or relative, or other suitable person as Managing Conservator, the Department alleges pursuant to §153.131 of the Texas Family Code that the appointment of the parent or parents would not be in the best interest of the child because the appointment of the parent or parents would significantly impair the child's physical health or emotional development.

            Pursuant to §153.191, Texas Family Code, the appointment of a parent as permanent possessory conservator of the child is not in the best interest of child  and parental possession or access would endanger the physical or emotional welfare of the child.

        13.1.2.    If conservatorship is awarded under this paragraph, the application of the guidelines for possession and access to the child, as set out in §§153.311, *et seq.*, Texas Family Code, would not be in the child's best interest.  The parents of the child, as possessory conservators of the child, should have limited access to and possession of the child, under conditions and restrictions prescribed by the court for the best interests of the child.

With this petition, CPS also filed a removal affidavit signed by Ericka Davis.  The removal affidavit is attached as **Exhibit 2**.  All of the false, misleading, and omitted parts of the affidavit as they relate to allegations of medical abuse are discussed above.  In addition, the affidavit also contained a refence to the child's father, Jason Wyatt.  Davis indicated, in her removal affidavit, that Jason Wyatt, the child's father, seemed to corroborate allegations of medical child abuse, but Davis neglected to include that Wyatt and James had separated in February 2016 and Wyatt moved out of the country approximately a year later.  Davis failed to indicate that Wyatt had very minimal contact with the child.   Davis failed to indicate that Wyatt had openly used drugs on a regular basis for approximately ten years.   David failed to indicate that Wyatt had a child support judgment against him, and this judgment was likely the reason why he moved out of the county – to avoid paying child support.  Wyatt was not a credible witness nor a good placement option for the child. James was not provided a copy of the removal affidavit, attached as **Exhibit 2**, until September 15, 2017.

12. **September 15, 2017**

The State District Court signed the order removing the child from James and placing the child into the custody of the CPS.

## CLAIM FOR SUBSTANTIVE DUE PROCESS;
## CLAIM FOR INTERFERENCE WITH FAMILY INTEGRITY;
## CLAIM OF UNLAWFUL SEARCH AND SEIZURE;
## CLAIM FOR FRAUD, CONSPIRACY TO DEFRAUD

Plaintiff incorporates by reference all facts as stated above.

Defendants, acting individually, and in concert with one another, from September 6, 2017 through September 21, 2017, and thereafter, violated James's substantive due process rights to familial association, familial autonomy, familial integrity, family privacy, unreasonable searches and seizures, by arbitrarily separating the child from her mother, the Plaintiff, and into State protective custody without possessing the requisite definite and articulable evidence giving rise to a reasonable suspicion that the child had been, or would be abused or neglected, by James. Such acts resulted in the depravation of James' right to raise her child. Such acts amounted to fraud, and a conspiracy to defraud James of her Constitutional Rights.

Given that the Defendants acted intentionally, recklessly and/or with deliberate indifference to the consequences of their actions as set forth above James seeks an award of punitive damages, individually, against Texas Children's Hospital, Dr. Graf, Dr. Lye, Dr. Donaruma, Dr. Robertson, and Dr. Louis.


## INJUNCTIVE, EQUITABLE, AND DECLARATORY RELIEF
## AGAINST OFFICIAL CAPACITY DEFENDANT

James requests declaratory relief that her rights were violated.

The actions and inactions of Commissioner Trevor Woodruff, in his official capacities, for failing to implement policies and procedures preventing the removal of children, such as the child this, on the basis of falsified evidence.

## CLAIM FOR RELIEF

WHEREFORE, AJSHAY JAMES, Plaintiff, seeks the following relief:

1. All declaratory and/or equitable relief as plead for above;

2. Any actual monetary losses sustained by the Plaintiff as a direct result of the violations;

3. Compensatory damages against the Defendants because of the past and future physical and mental pain, distress, loss of reputation, and inconvenience caused by its discriminatory actions;

4. Attorney fees, litigation expenses and costs incurred in obtaining relief and pursuing this action;

5. The interest on the amount described in the items listed above, calculated at the prevailing rate;

6. Post judgment interest; and

7. Any other relief the court deems just and proper.

## THE PLAINTIFF DEMANDS A JURY TRIAL

Respectfully submitted,

**THE POERSCHKE LAW FIRM, PC**

/s/ R. Scott Poerschke, Jr.
R. SCOTT POERSCHKE, JR.
Bar. No. 24067822
5111 Center Street
Houston, Texas 77007
Phone 713.974.1600
Fax 713.621.2106
scott@rsplegal.com

**ATTORNEY FOR LAUREN MORAN**

## **CERTIFICATE OF SERVICE**

I certify that on January 17, 2020, a copy of the above was served on counsel of record for the parties as follows:

**Scot M Graydon**  *Via ECF scot.graydon@oag.texas.gov*
Assistant Atty General
General Litigation Division
PO Box 12548 Capital Station
Austin, TX 78711
512-463-2120
Fax: 512-320-0667
Attorney for Defendants Azelia Walker-
Smith, Monica Sanders, Candace J.
Broussard-White, Marilyn Polk, Ericka
Davis, Sherry Gomez, and Shelly Martin.


**John Salvatore Serpe**  *Via ECF  jserpe@serpejones.com*
2929 Allen Parkway, Ste 1600
Houston, TX 77019
713-452-4444
Fax: 713-452-4499
Attorney for Katie C. Evans and Amy
Lynn Small.


**E. Dale Burrus**  *Via ECF  burrus@krogerlaw.com*
Kroger Burrus
3100 Weslayan, Ste 300
Houston, TX 77027
713-961-7952
Fax: 713-961-7953
Attorney for Cara G. Lye, Jeanine Graf,
and Ricardo Quinonez.


/s/R. Scott Poerschke
Attorney for Plaintiff