United States District Court
Southern District of Texas
**ENTERED**
June 17, 2020
David J. Bradley, Clerk

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| **AJSHAY JAMES,** | § | |
| | § | |
| **Plaintiff,** | § | |
| **VS.** | § | **CIVIL ACTION NO. 4:19-CV-03485** |
| | § | |
| **AZELIA WALKER-SMITH,** *et al*, | § | |
| | § | |
| **Defendants.** | § | |

## MEMORANDUM & ORDER

This § 1983 action arises out of the alleged acts and omissions of three social workers with the Texas Department of Family & Protective Services (TDFPS), three social workers at Texas Children's Hospital (TCH), and five doctors affiliated with the Baylor College of Medicine (BCM) who work at TCH (collectively, "Defendants").[1] Plaintiff Ajshay James alleges that Defendants deprived her of her parental rights as guaranteed by the Fourteenth Amendment when they conspired in September 2017 to temporarily separate her from her child without a lawful court order, and then permanently removed her child through the use of false and misleading statements.

Defendants filed a series of six, interrelated motions to dismiss. The Court held a hearing on the motions to dismiss on May 27, 2020. After hearing argument on the motions, the Court granted them in part and denied them in part. The Court's rulings and rationales are set forth herein.

## I.      Plaintiff's Allegations

For purposes of reviewing Defendants' motions to dismiss, the Court accepts all well-pleaded facts as true and views them in the light most favorable to James. The central allegations in James's amended complaint (Doc. No. 39) are as follows:

---

[1] Plaintiff also brings claims against TCH and the Commission of TDFPS in her official capacity.

James gave birth to her child on September 9, 2015 at Texas Woman's Hospital. (*Id.* at 4.) At the time of birth, the child was a "micro-preemie"—weighing only 13 ounces—and had to spend its first sixteen weeks in an incubator with oxygen support. (*Id.*) It took the child approximately five months to be discharged from the hospital. (*Id.*)

In August 2016, the child was placed under the care of Dr. Penelope Louis at TCH: Main Campus. (*Id.* at 5.) Dr. Louis became the child's primary pediatrician and continued in that position for a year until August 2017, when the circumstances underlying this action began. (*Id.* at 5–6.) During that year, Dr. Louis never raised any concerns about James's ability to care for her child. (*Id.*) The Child Abuse Pediatrics team at TCH referred concerns about potential medical child abuse to Dr. Louis on August 2016. (*Id.* at 6.) But Dr. Louis, rather than reporting James, determined that she "is over reporting secondary to her own anxiety and lack of knowledge regarding normal ranges for patient outside of neonatal range." (*Id.*) James acknowledges that she was extremely anxious and hyper-vigilant about her child's health at the time. (*Id.*) Dr. Louis approved or ratified all diagnoses, medicines, and treatments for the child, including the use of oxygen for respiratory support. (*Id.* at 6–8.)

When Hurricane Harvey hit, James's home flooded and she and her child had to be rescued on August 27, 2017. (*Id.* at 8.) After the rescue, James requested that her child be taken to TCH: Main Campus. (*Id.*) Instead, she and the child were eventually taken to TCH: West Campus. (*Id.* at 8–9.) There a sleep study was conducted at the instruction of Dr. John Robertson, the child's pulmonologist, and it was determined the child no longer needed to use oxygen. (*Id.* at 9.) The medical records reflect that James was delighted by this news and followed the doctor's recommendation to take the child off of oxygen support. (*Id.*) The child was discharged from TCH: West Campus on September 5, 2017. (*Id.* at 10.)

2

That same day, Dr. Jeanine Graf, who was then the Chief Medical Director for TCH: West Campus, spoke with Dr. Robertson and Dr. Louis. (*Id.* at 13.) According to Dr. Graf, both doctors told her that their "care decisions" for the child "have been initiated based on parental history and not witnessed events or workup." (*Id.*) Based on those conversations and hospital observations, Dr. Graf formed concerns about "pediatric fabrication." (*Id.* at 14.) Plaintiff alleges those concerns are readily refuted by the significant medical examinations, observations, and testing in the child's medical records, to which Dr. Graf had access. (*Id.* at 13.) Nonetheless, Dr. Graf wrote a letter on September 5, 2017, stating: "In my opinion [the child] is the victim of medical abuse. I recommend a therapeutic separation from the mother. The separation will be both diagnostic and therapeutic in making the diagnosis of medical abuse." (Doc. No. 39-1, at 20.)

The same day that Dr. Graf wrote her letter, Jennifer Stansbury, a social worker at TCH, made a referral to TDFPS regarding "increased concerns for medical child abuse." (Doc. No. 39, at 10.) Plaintiff alleges that the referral contained significantly misleading statements and omissions, such as that "James previously had [the child] in a helmet for 23 hours a day although she did not require it," and that "James arrived to the hospital completely dry and dressed in designer wear." (*Id.* at 10–12.) A specialist at TCH had previously directed James to have the child wear a custom-made helmet 23 hours a day to allow the child's cranium to form properly, as is common for micro-preemies; James stopped use of the helmet in February 2017 when so directed by the specialist. (*Id.* at 11.) As for her clothes, James claims she showed up at the hospital in used clothes pulled from a lost-and-found bin after her rescue. (*Id.* at 12.)

On September 6, 2017, Dr. Graf called a conference. In attendance were, at a minimum, Dr. Graf, Dr. Marcella Donaruma-Kwoh, a Child Abuse Pediatrician at TCH, and two TDFPS social workers, Ericka Davis and Shelly Martin. (*Id.* at 13.) James alleges that "it was at that

conference that the Defendants formed a meeting of the minds and formulated a plan to remove the child from James." (*Id.*) Specifically, James alleges that the conference resulted in a three-step plan to separate James from her child. (Doc. 39, at 18.) The first step was for "caseworkers Ericka Davis and Shelly Martin, to coerce James to return the child back to TCH: West Campus." (*Id.*) The second step was for TCH social workers to "separate James from the child without legal justification. Stall James and forbid her from seeing the child so that [TDFPS] could have enough time to obtain a removal after receiving approval from [TDFPS] supervisors." (*Id.*) The third step was for TCH doctors to "document in the medical records, as ordered by Dr. Graf, that a separation test needed to be performed on the child to determine whether she was a victim of child abuse." (*Id.*) Plaintiff alleges that, "[i]n reality, this separation test was a fraud to show TCH personnel why they were keeping the child away from her mother." (*Id.*)

That same day, TDFPS social workers Davis and Martin went to James's home without prior warning. (*Id.*) They told James that she needed to take the child back to TCH: West Campus, or otherwise TDFPS would come back with an order removing the child and "things were going to be worse." (*Id.* at 19.) James complied and returned the child to TCH: West Campus that very day. James was then separated from her child so that the "therapeutic separation" could began. (*Id.* at 20.) James did not understand the reason for the separation, and the TCH doctors and social workers purposefully did not explain it to her. (*Id.* at 12.) On this first day of the separation, Dr. Graf went into the child's medical records and marked ten of her medical conditions as "resolved." (*Id.* at 21–22.) Dr. Graf then weaned the child off of several prescribed medications. (*Id.* at 22.)

On September 7, 2017, Arzalia Smith, a TDFPS supervisor, informed TCH social worker Amy Small that there was no legal basis for the separation because TDFPS did not have a signed safety plan from James. (*Id.* at 19.) Later that day, Davis presented James with a safety plan to sign

but did not explain it to her and told her she was signing only to acknowledge receipt, not agree to the plan. (*Id.* at 20.) James also authorized TDFPS to access the child's medical records. (*Id.*) James alleges that "[e]ven the most cursory review of that file would have determined that the child's medical conditions were based upon objective examinations and tests." (*Id.*)

The "therapeutic separation" continued for another two days until September 8, 2017. (*Id.*) During that time, Dr. Graf never gave James an opportunity to agree to reduced medical treatment or medication for the child. (*Id.* at 21.) Moreover, prior to the separation, Dr. Graf had spoken very little with James and never observed her interact with the child for any length of time greater than ten minutes. (*Id.* at 21–22.) On September 8, 2017, Dr. Donaruma-Kwoh wrote a letter diagnosing the child as a "victim of medical abuse." (Doc. 39-1, at 14.) That letter, and a follow-up letter from Dr. Graf, were presented to Davis. (*Id.* at 5.)

On September 8, 2017, TDFPS social workers attempted to get a court order for emergency removal of the child, but were unsuccessful. (Doc. 39, at 23.) Thereafter, Katie Evans, a TCH social worker, indicated in the child's medical records that the plan, formulated by TDFPS and TCH, was to continue to keep information about the child from James and, if she appeared at TCH to attempt to collect the child, to try to "SLOWLY get mother to the floor and to bedside to allow social work and [TDFPS] as much time as possible to get [TDFPS] to the hospital before mother can take the patient." (*Id.* at 24.) There was also a plan in place "to have security and social work called if mother presents to the hospital." (*Id.*)

On September 14, 2017, TDFPS supervisor Smith contacted TCH social worker Small to tell her that TDFPS would be allowing the child to return home with James because their investigation had determined the child "would not be in imminent harm if returned to mother today" and because "mother has cooperated with the therapeutic separation." (*Id.* at 24.) James

alleges that Small responded by fabricating two unfounded concerns, namely, that if the child were returned, James would flee the Houston area with her and/or find another medical provider that would put the child on unneeded medications. (*Id.*) Small also shared these remarks with a pediatrician at TCH, named Dr. Cara Lye, who, within minutes, added a note to the child's medical record claiming that "if she were to be discharged to the mother's care she is in imminent danger and at risk of death." (*Id.*) Small then immediately provided a copy of that note to Smith. (*Id.*) Later that day, Davis delivered a notice of emergency removal to James. (*Id.*) James alleges that the removal notice was the first notice she received that she was under suspicion for alleged medical child abuse. (*Id.* at 12.)

On September 15, 2017, TDFPS filed a petition in family court to be appointed permanent sole managing conservator for the child. (*Id.* at 26.) Davis filed a removal affidavit along with the petition. (Doc. No. 39-1, at 1–8.) Plaintiff alleges that Davis knowingly, or recklessly, prepared the affidavit with "false, misleading, and omitted" information. (Doc. 39, at 27). Specifically, Plaintiff points to statements in the affidavit taken from the initial referral that Stansbury provided to TDFPS on September 6, 2017. Plaintiff alleges that "even the most cursory review" of the child's medical file, to which Davis had access starting September 7, 2017, would have revealed those statements to be false and misleading. (*Id.* at 20.) Plaintiff also points out that Davis omitted from the affidavit the fact that, during her September 6, 2017 visit to James's residence, the child appeared healthy and happy, and was no longer on oxygen, as directed by Dr. Robertson. Finally, Plaintiff alleges that Davis included in the affidavit statements from the child's father, Jason Wyatt, that seemed to corroborate allegations of medical abuse, but omitted crucial facts about Wyatt's credibility, including that Wyatt and James had separated in February 2016, that a year later Wyatt moved out of the country, that Wyatt had minimal contacts with the child, that Wyatt openly and

regularly used drugs for a decade, that Wyatt had an outstanding child support judgment, and that Wyatt likely left the United States to avoid paying child support. (*Id.* at 27.)

On September 15, 2017, the family court signed an order giving TDFPS temporary managing conservatorship of the child on an emergency basis. (*Id.* at 27.) On November 9, 2017, following an adversary hearing, TDFPS was awarded temporary managing conservatorship during the pendency of the underlying removal case. (Doc. No. 60, at 15.) TDFPS eventually dismissed the case against James on March 7, 2019, although the child's grandparents, rather than James, continue to have primary conservatorship of the child. (Doc. No. 61, at 5.)

Plaintiff filed her original pro se complaint in this matter on September 13, 2019. After hiring counsel, Plaintiff filed an amended complaint on January 17, 2020. In her amended complaint, James brings claims, pursuant to 42 U.S.C. § 1983, for the violation of her due process right to family integrity and her right to be free from the unreasonable seizure of her child, as well as state law claims for fraud and conspiracy to commit fraud. (Doc. No. 39, at 28.)

## II.    Defendants' Motions to Dismiss

The individual defendants in this case fall into three categories: BCM doctors who work at TCH (Doctors Graf, Donaruma-Kwoh, Lye, Louis, Robertson), social workers who work for TCH (Small, Evans, and Stansbury), and employees of TDFPS (Davis, Martin, Smith). Plaintiff has also sued TCH and the commissioner of TDFPS in his official capacity. Defendants have moved for Rule 12(b)(6) dismissal on several overlapping grounds. Three issues dominate. The TCH social workers and doctors (collectively, "TCH Defendants") argue for dismissal on the ground that James has failed to plead that they are state actors for purposes of § 1983. The TDFPS employees argue for dismissal on the ground that James has failed to allege specific facts to overcome their

qualified immunity. All Defendants argue that James's § 1983 claims are time-barred. The Court addresses these three arguments first, before turning to others raised in the motions to dismiss.

### A. Conspiracy and State Action

A private party may be held liable under § 1983 if they are a "willful participant in joint activity with the State or its agents." *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 152 (1970). One way to plead joint activity is to plead that private citizens conspired with or acted in concert with state actors. *Id.* If a conspiracy is alleged, specific facts must be pleaded; conclusory allegations do not suffice. *Hale v. Harney*, 786 F.2d 688, 690 (5th Cir. 1986). In pleading these specific facts, a plaintiff must plead factual allegations showing (1) an agreement between the private and state actor defendants to commit an illegal act and (2) a resulting deprivation of the plaintiff's constitutional rights. *Priester v. Lowndes County*, 354 F.3d 414, 420 (5th Cir. 2004); *Cinel v. Connick*, 15 F.3d 1338, 1343 (5th Cir. 1994). Conspiracy, as a form of joint action in the § 1983 context, is asserted "on more or less traditional principles of agency, partnership, joint venture, and the like." *Nesmith v. Alford*, 318 F.2d 110, 126 (5th Cir. 1963).

James alleges that the TCH Defendants are state actors because they conspired with the TDFPS social workers to achieve the permanent removal of James's child through fabrication and unlawful separation. Specifically, James alleges that Defendants agreed to a plan that involved three phases, each carried out by a different group of defendants. Phase one involved the TDFPS defendants coercing James into bringing the child back to TCH; phase two involved the TCH social worker defendants keeping James separated from her child, without legal basis or adequate explanation, until a removal order could be obtained; and phase three involved the TCH doctor defendants carrying out a fake separation test to make it appear the hospital was evaluating for medical abuse, when in reality the test was a front for keeping James separated from her child.

The issue before the Court is whether James has pleaded specific facts which, when accepted as true, state a substantial claim of conspiracy under § 1983. The Court finds that James has met this standard for most TCH Defendants. As detailed above, James has alleged that Defendants engaged in concrete, coordinated actions aimed at realizing the child's removal, based upon Dr. Graf's allegedly unfounded theory of medical abuse, by misconstruing facts in support of removal and/or unlawfully keeping James separated from her child until a removal order could be obtained. Construing these allegations in the light most favorable to James, they suffice to plead "an agreement between the private and state actor defendants to commit an illegal act." *Priester*, 354 F.3d at 420; *c.f. Fairchild v. Liberty Independent School District*, 2007 WL 9717916 at *3 (E.D. Tex. March 16, 2007) (holding that plaintiff adequately pleaded that private actors conspired with her school district to deprive her of her first amendment rights at a reinstatement hearing, where plaintiff alleged discrete actions taken by the private actors that tended to show they were "aware of and participating in an effort to hinder [her] public speech at the hearing").

Consideration of the allegations against each individual defendant makes clear James has offered more than "conclusory allegations" in relation to most of them. James alleges that Dr. Graf formulated the theory of medical abuse despite compelling contrary evidence in the child's medical file, organized the September 6th meeting to create a plan to remove the child, arranged for a sham therapeutic separation, prematurely marked numerous conditions as "resolved" on the child's medical records, and declined to give James an opportunity to accept or reject reduced treatment for the child. James alleges that Dr. Donaruma-Kwoh participated in the conspiracy by attending the September 6th meeting and confirming Dr. Graf's allegedly fraudulent assessment in her September 8th letter diagnosing the child as a victim of medical abuse. Dr. Lye allegedly participated by adding a note to the child's medical record on September 14th indicating that the

child would be in imminent danger and at risk of death if returned. James alleges this note was based on unfounded concerns, and was added for the sole purpose of thwarting the child's return. Stansbury allegedly participated by writing an initial referral to TDFPS containing false and misleading information. Evans allegedly participated by explaining to her coworkers at TCH that, because James had the legal right to take the child home starting September 8th, the plan was to keep James uninformed about the child and stall her arrival, including by calling security, in order to allow TDFPS as much time as possible to get a removal order. Small allegedly participated by keeping James ill informed about the purpose of the separation, telling her coworkers to call security if James appeared at the hospital, and prompting Dr. Lye to add an unfounded note about imminent risk of death to the child's file for the sole purpose of preventing the child's return to James. These allegations suffice to state a claim that the above TCH Defendants participated in a plan to separate James from her child through unlawful means.

The exceptions are Dr. Louis and Dr. Robertson. James pleads only that Dr. Graf said she formed her medical abuse theory in part after those doctors told her "their care decisions have been initiated based on parental history and not witnessed events or workup." (Doc. 39, at 13). This allegation does not suffice to state a plausible claim of participation in the alleged agreement.

For all other TCH Defendants, however, James has plausibly pleaded participation in her alleged conspiracy. But an alleged agreement to commit an unlawful act does not suffice to plead conspiracy in the § 1983 context. James must also plausibly plead "a resulting deprivation of the plaintiff's constitutional rights." *Priester*, 354 F.3d at 420. As will be discussed in detail in the next section, the Court determines that James has stated a claim for the deprivation of her constitutional rights. Accordingly, James has plausibly pleaded that all TCH Defendants, except for Doctors Louis and Robertson, are state actors for purposes of her § 1983 claims.

### B.  Qualified Immunity

Arzalia Smith, Ericka Davis, and Shelly Martin ("TDFPS Defendants") assert the defense of qualified immunity. "Qualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." *Reichle v. Howards*, 566 U.S. 658, 664 (2012) (citation omitted). The Court will proceed in its qualified immunity analysis by determining (i) whether the facts alleged state a plausible claim that TDFPS Defendants violated James's constitutional rights; if so, (ii) whether those rights were clearly established at the time of the incident at issue; and, if so, (iii) whether TDFPS Defendants' conduct was objectively unreasonable in light of then clearly established law. *See Gates v. Texas Dep't of Protective & Regulatory Servs.*, 537 F.3d 404, 419 (5th Cir. 2008).

### i.     *Whether Allegations Establish a Constitutional Violation*

James alleges violations of her Fourteenth Amendment due process right to family integrity. This right can be described as "the right of the family to remain together without the coercive interference of the awesome power of the state." *Hodorowski v. Ray*, 844 F.2d 1210, 1216 (5th Cir. 1988). The Supreme Court has long recognized that this right is protected under the constitution. *See Santosky v. Kramer*, 455 U.S. 745, 747–48 (1982); *Stanley v. Illinois*, 405 U.S. 645, 651 (1972). But "the right is not absolute." *Marks v. Hudson*, 933 F.3d 481, 485 (5th Cir. 2019). "[T]he right to family integrity must be balanced against the state's interests in protecting the health, safety, and welfare of children." *Romero v. Brown*, 937 F.3d 514, 520 (5th Cir. 2019) (quoting *Wooley v. Baton Rouge*, 211 F.3d 913, 924 (5th Cir. 2000)). "Even so, some procedural due process must be provided before parents are deprived of their liberty interest in the custody and management of their child." *Marks*, 933 F.3d at 485.

The Court discerns two alleged constitutional violations against TDFPS Defendants. James alleges that Defendant Davis achieved the child's removal in an unconstitutional manner by filing an affidavit with the family court containing "false, misleading, and omitted" information. And James alleges that TDFPS Defendants participated in an unconstitutional seizure of her child by allegedly coercing James to return the child to TCH, tricking her into signing a safety plan allowing for the trial separation, and coordinating with TCH social workers to keep her apart from the child even after the trial separation had ended. The Court must decide whether these allegations suffice to state claims for the violation of James's constitutional rights.

"[A] constitutional violation occurs if an official makes a knowing, intentional, or reckless false statement or omission that causes the issuance of a warrant without probable cause that leads to the removal of a child from its parent's custody." *Marks*, 933 F.3d at 486 (citing *Franks v. Delaware*, 438 U.S. 154, 155–56 (1978)). Thus, "an actionable Fourteenth Amendment claim exists for a false affidavit submitted to a court for the purpose of obtaining a child seizure order." *Id.* As detailed above, Plaintiff alleges that Davis knowingly, or at least recklessly, submitted a removal affidavit to the family court with false, misleading, and omitted information about the child's past medical care, Davis's September 6th visit to James's residence, whether the child was in imminent danger, whether reasonable efforts had been made to prevent the removal of the child, and the credibility of statements from the child's father, thereby causing the family court to award TDFPS temporary managing conservatorship of the child.

To assess whether James has stated a constitutional violation, the Court must accept the well-pleaded claims of falsehood and omissions, and then determine if the asserted fabrications and omissions were necessary to the family court's conservatorship determination. *Id.* at 488. Courts make this determination by removing all plausibly claimed fabrications and inserting all

plausibly claimed omissions to see if the revised affidavit would still have supported the same outcome. *Id.* at 487–88. Here, the reconstructed affidavit is significantly different than the original. It contains information from the child's medical records allegedly indicating that her medications and past treatments were prescribed based on objective testing and medical examinations. It omits statements from Stansbury's initial referral that are allegedly refuted by the child's medical records. It describes how, during Davis's and Martin's September 6th visit to James's residence, the child allegedly appeared healthy and happy and was no longer on oxygen per doctor's orders. It includes James's allegation that Dr. Graf and Dr. Donaruma-Kwoh had limited interactions with James, and never gave her a chance to accept their medical advice that the child be weaned off of certain medications before diagnosing medical abuse. And it contains all relevant information about the child's father, Jason Wyatt, that James alleges casts doubt on the credibility of his statements. So reconstructed, the affidavit provides not only grounds for questioning the thoroughness of the doctors' medical abuse diagnosis and the trustworthiness of Mr. Wyatt's corroboratory testimony, but also important evidence that the child was not in immediate danger following discharge from TCH. Indeed, on the facts alleged, TDFPS even acknowledged the lack of imminent harm in a September 14, 2017 email to TCH, before abruptly reversing its position after receiving Dr. Lye's note. That note, which asserts without reason that the child would be "in imminent danger and at risk of death" if returned to James, is notably absent from Davis's affidavit. The Court finds that the reconstructed affidavit does not support a finding of "immediate danger to the physical health or safety of the child," or a finding "that reasonable efforts were made to prevent the removal of the child," both of which are required for a temporary order of removal.

*See* TEX. FAM. CODE § 262.102(a).[2] James has stated a claim that Davis violated her rights under the Fourteenth Amendment by submitting a false and misleading affidavit to the family court for the purpose of obtaining the child's removal.

The Fourteenth Amendment also guarantees that "the government may not seize a child from his or her parents absent a court order, parental consent, or exigent circumstances." *Gates*, 537 F.3d at 429. James alleges that TDFPS Defendants seized the child on September 6, 2017, without court order, consent, or exigent circumstances. TDFPS Defendants do not argue that their actions on September 6th were justified by exigent circumstances, which exist when "there is reasonable cause to believe that the child is in imminent danger of physical or sexual abuse if he remains in his home" *Id.* Instead, TDFPS Defendants argue that there was no seizure on September 6th because James chose to voluntarily take the child to the hospital.

James denies that she voluntarily returned the child to TCH. She alleges that Davis coerced her into taking the child back to TCH by threatening to come back with an order removing the child if she did not comply. Moreover, James alleges that, once the child was at TCH, Davis extended the seizure by getting James to sign a safety plan authorizing the trial separation by telling James she was signing to acknowledge receipt, not agree to the plan. James further alleges that Davis and others purposefully kept her in the dark about the reason for the separation, as well as the fact that nothing legally prevented James from taking the child back home. Finally, James alleges, based upon notes in the child's medical records, that there was a plan in place, agreed to

---

[2] TDFPS Defendants argue that this conclusion cannot be correct because, at the adversary hearing in November 2017, in which James and her counsel participated, the family court still found probable cause for removal. This argument does not engage with the correct counterfactual. The issue is not whether a misleading affidavit would have still supported probable cause if it had been subjected to the adversary process. The issue is whether the affidavit, cleansed of its misleading character, would have supported probable cause.

by TDFPS and TCH social workers, to immediately call hospital security and Davis or her supervisor, if James appeared at the hospital requesting to take her child home. A child is seized if, in view of all surrounding circumstances, a reasonable parent or guardian would have believed she was not free to leave with the child. *See Gates*, 537 F.3d at 431. Taking all of James's allegations as true, and drawing all inferences in her favor, the Court concludes that James has plausibly pleaded that her child was unlawfully seized beginning September 6, 2017, and that Davis participated in the unlawful seizure in violation of James's constitutional rights.

In sum, accepting as true all well-pleaded facts, James has stated two claims against Davis for the violation of her constitutional rights. The first concerns the allegedly false and misleading affidavit Davis submitted to family court. The second concerns Davis's participation in the alleged seizure of her child. James has not, however, plausibly pleaded a constitutional injury in relation to either Smith or Martin, who play a significantly more minor role in her pleadings. James's Fourteenth Amendment claims against Smith and Martin are dismissed without prejudice.

## ii.    *Whether the Constitutional Rights were Clearly Established*

The next issue is whether the Fourteenth Amendment rights upon which James relies were clearly established in September 2017. A clearly established right is one that is "sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Reichle*, 566 U.S. at 664 (internal quotations and alteration omitted). This inquiry "does not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (citations omitted).

In *Wernecke v. Garcia*, 591 F.3d 386 (5th Cir. 2009), the Fifth Circuit held that, as of at least June 2005, it was clearly established that Fourth Amendment procedures and standards apply to social workers' investigations. *Id.* 399–400; *See also Gates*, 537 F.3d at 435 (holding that

process that satisfies Fourth Amendment standards is adequate to protect parents' Fourteenth Amendment liberty interest in their child's custody). Accordingly, the Fifth Circuit has held, in relation to a 2015 incident, that it was then clearly established that an actionable Fourteenth Amendment claim exists for a false affidavit submitted by a social worker for the purpose of removing a child. *See Marks*, 933 F.3d at 486–87 (citing *Franks*, 438 U.S. at 155–56). Similarly, in relation to a 2016 incident, the Fifth Circuit has held that it was then clearly established that a social worker may not seize a child absent a court order, consent, or exigency. *Romero*, 937 F.3d at 521–22 (citing *Gates*, 537 F.3d at 434; *Wernecke*, 591 F.3d at 391 n.7). The rights that Davis allegedly violated were clearly established by September 2017, when the events giving rise to the allegations in this case occurred.

### iii.   Whether the Conduct was Objectively Unreasonable

The final step involves considering whether Davis's conduct was objectively reasonable in light of then clearly established law. *See Freeman v. Gore*, 483 F.3d 404, 411 (5th Cir. 2007). "To make this determination, the court applies an objective standard based on the viewpoint of a reasonable official in light of the information then available to the defendant and the law that was clearly established at the time of the defendant's actions." *Id.* (citations omitted). If TDFPS social workers of reasonable competence could reasonably—even though mistakenly—have believed Davis's conduct did not violate James's clearly established constitutional rights, then Davis is entitled to qualified immunity. *See Anderson v. Creighton*, 483 U.S. 635, 641 (1987).

In the context of *Franks* claims, a showing that an official either knew, or recklessly disregarded, that her material omissions and false statements could lead to a seizure without probable cause, "is sufficient to support a finding that his conduct was unreasonable in light of the well-established principle requiring probable cause for the issuance of an arrest warrant." *Winfrey*

*v. Rogers*, 901 F.3d 483, 494 (5th Cir. 2018). This approach makes sense because no reasonable official would believe it is constitutional to obtain a seizure order by acting recklessly or dishonestly. James alleges Davis was aware of, or recklessly disregarded, the alleged material omissions and falsehoods in the affidavit she submitted for the purpose of obtaining the child's removal. These allegations suffice to state a claim that Davis acted objectively unreasonably.

For James's unlawful seizure claim, the issue is whether, taking all allegations as true, a competent TDFPS social worker could have reasonably, though mistakenly, believed that James had consented to the seizure, or that the child was not seized. James alleges that Davis coerced her into returning the child to TCH, and then tricked her into signing a safety plan authorizing the trial separation by intentionally keeping her in the dark about the purpose of the separation, and telling her she was signing the plan only to acknowledge having received it. Taking these allegations— which include allegations of deception—as true, no reasonable social worker could believe James voluntarily consented to the separation. Further, it would be objectively unreasonable to deny that the trial separation constituted a seizure, given that it is undisputed that James was not allowed to see her child during the trial separation. Indeed, Davis's supervisor allegedly emailed TCH on September 7th to explain that, until TDFPS had a signed safety plan from James, there was no legal basis for the separation. Assuming, as the Court must, that Davis knew James's consent was not valid, it was objectively unreasonable for her to participate in the child's separation which, under the circumstances, no reasonable social worker would deny qualified as a seizure.

Defendant Davis is not entitled to qualified immunity for James's Fourteenth Amendment claims. The claims against Defendants Smith and Martin are dismissed without prejudice for failure to state a constitutional injury.

### C. Statute of Limitations

Section 1983 does not have its own statute of limitations. With respect to claims brought pursuant to § 1983, a federal court must borrow the forum state's general personal injury limitations period. *See Owens v. Okure*, 488 U.S. 235, 249–50 (1989). In Texas, the applicable period of limitations is two years. Tex. Civ. Prac. & Rem. Code § 16.003. However, although the applicable limitations period is determined by state law, the accrual of a cause of action is resolved by federal law. *Wallace v. Kato*, 549 U.S. 384, 388 (2007). Under federal law, "the limitations period commences when the aggrieved party has either knowledge of the violation or notice of facts which, in the exercise of due diligence, would have led to actual knowledge thereof." *Jensen v. Snellings*, 841 F.2d 600, 606 (5th Cir.1988).

"A statute of limitations may support dismissal under Rule 12(b)(6) where it is evident from the plaintiff's pleadings that the action is barred and the pleadings fail to raise some basis for tolling or the like." *Jones v. Alcoa, Inc.,* 339 F.3d 359, 366 (5th Cir. 2003) (citations omitted). "Whether a plaintiff exercised due diligence in a particular case is a question of fact, and its resolution depends in each case upon the circumstances faced by the plaintiff." *Newman v. Coffin*, 464 Fed. Appx. 359, 362 (5th Cir. 2012) (citing *Summer v. Land & Leisure, Inc.*, 664 F.2d 965, 970 (5th Cir. 1981)).

James filed a pro se application to proceed *in forma pauperis* on September 12, 2019, and her initial complaint was docketed the following day. (Doc. 1.) Of the current defendants, half were named as defendants in this original complaint: Davis, Martin, Smith, Small, Evans, Lye, and Graf. The other half were added in January 17, 2020, when James's newly-hired counsel filed an amended complaint on her behalf. (Doc. 39.) Those later-added defendants are: Robertson, Louis, Donaruma-Kwoh, Stansbury, TCH, and the Commissioner of TDFPS.

All Defendants argue that James's claims are time barred on the face of her complaint. But that argument is readily dismissed for at least those defendants named in the original complaint. Plaintiff pleads that she was not aware of any injury until September 14, 2017, when she was served with removal papers, because prior to then, Defendants were taking steps to actively conceal their efforts to have the child removed from her custody. These allegations suffice to state a facially plausible claim that James's § 1983 claim accrued no earlier than September 14, 2017. Because Plaintiff filed her original complaint on September 13, 2017, the defendants named in that complaint do not have a viable argument for dismissal based on the statute of limitations.

Whether James's claims against the defendants added for the first time in the January 2020 complaint are timely presents a closer call. James's primary argument for the timeliness of her claims against those defendants invokes the idea of reasonable diligence. Under federal law, accrual of the statute of limitations commences only "once the plaintiff acquires possession of two critical facts: (1) an injury has occurred; and (2) the identity of the person who inflicted the injury." *Stewart v. Parish of Jefferson*, 951 F.2d 681, 684 (5th Cir. 1992). James alleges that "the identify of all the players in this case was only discoverable after carefully reviewing the facts as contained in the child's over 9,000 page medical file with TCH, which would have reasonably occurred soon after the removal, near the end of January, 2018, after the dust had settled on the removal action." (Doc. 60, at 15). Because these allegations raise issues of material fact regarding when James knew or should have known about her injury, dismissal on statute of limitations grounds is not appropriate. *See Frame v. City of Arlington*, 657 F.3d 215, 240 (5th Cir. 2011) ("Because the statute of limitations is an affirmative defense and not a pleading, it is an issue that must be

resolved through discovery and summary judgment or trial.").[3] The Court accordingly declines to dismiss James's § 1983 claims as time-barred.

### D.  Claims against the TDFPS Commissioner

James has brought § 1983 and state law claims against the TDFPS Commissioner in her official capacity. The Commissioner argues that those claims are barred by Eleventh Amendment immunity. "The eleventh amendment generally divests federal courts of jurisdiction to entertain citizen suits directed against states." *Stem v. Ahearn,* 908 F.2d 1, 3 (5th Cir. 1990). "The bar applies not only to the state itself, but also protects state actors in their official capacities." *K.P. v. LeBlanc*, 627 F.3d 115, 124 (5th Cir. 2010). "TDFPS is undisputedly a state entity that has not waived its immunity." *Thomas v. Texas Dep't of Family & Protective Servs*., 427 F. App'x 309, 312 (5th Cir. 2011). James has not contested the TDFPS Commissioner's assertion of Eleventh Amendment immunity. All claims against the TDFPS Commissioner are therefore dismissed with prejudice.

### E.  Claims against TCH

James brings § 1983 and state law claims against TCH as well. TCH argues that all claims against it are barred by res judicata because James already filed suit against TCH in state court arising from the same complaints asserted here, and that lawsuit was dismissed with prejudice.

---

[3] James also argues for equitable tolling based on Texas's rule that "when a defendant has fraudulently concealed the facts forming the basis of the plaintiff's claim, limitations does not begin to run until the claimant, using reasonable diligence, discovered or should have discovered the injury." *KPMG Peat Marwick v. Harrison County Hous. Fin. Corp.,* 988 S.W.2d 746, 750 (Tex. 1999). James has submitted a declaration attesting to her diligent but unsuccessful efforts to "obtain a complete copy of [the] child's medical records," including all notes detailing communications between defendants, which she claims "would likely reveal the true motivations and concerted action from all the Defendants in this case." (Doc. 71, at 5.) James alleges she has a lawful right to access the full file, but that TCH Defendants have sought to hinder her access, and that equitable tolling is appropriate because a party should "not be permitted to avail himself of the protections of a limitations statute when by his own fraud he has prevented the other party from seeking redress within the period of limitations." *Borderlon v. Peck*, 661 S.W.2d 907, 908-09 (Tex. 1983). These allegations further highlight that issue of material fact exist that make it inappropriate to dismiss James's claims as time-barred.

James previously filed two actions in Texas state court related to the underlying incident at issue in this case. In Cause No. 2018-00702, filed January 4, 2018, James alleged that Dr. Graf, Dr. Louis, and TCH made false and defamatory statements that James medically abused her child. (Doc. 68-4.) That suit was dismissed without prejudice on May 21, 2018, at James's request because she was unable to conduct discovery, depose witnesses, or produce an expert report in light of the then-pending TDPFS proceedings. (Doc. 68-5.) James filed her second state court lawsuit, Cause No. 2018-72490, against TCH only on October 9, 2018. (Doc. 68-6.) James sued TCH for defamation and intentional infliction of emotional distress. (Doc. 68-6.) The trial judge evaluated the claims, determined they were health care liability claims, and dismissed the case against TCH with prejudice after James failed to produce a mandatory expert report. (Doc. 68-6); *see* Tex. Civ. Prac. & Rem. Code § 74.351(b) ("If, as to a defendant physician or health care provider, an expert report has not been served . . . the court, on the motion of the affected physician or health care provider, shall . . . enter an order that . . . dismisses the claim with respect to the physician or health care provider, with prejudice to the refiling of the claim.").

"A federal court must give to a state-court judgment the same preclusive effect as would be given that judgment under the law of the State in which the judgment was rendered." *Migra v. Warren City Sch. Dist. Bd. of Educ.*, 465 U.S. 75, 81 (1984). "Under Texas law, res judicata applies if there is '(1) a prior final judgment on the merits by a court of competent jurisdiction; (2) identity of parties or those in privity with them; and (3) a second action based on the same claims that were raised or could have been raised in the first action.'" *Portillo v. Cunningham*, 872 F.3d 728, 735 (5th Cir. 2017) (citing *Citizens Ins. Co. of Am. v. Daccach*, 217 S.W.3d 430, 449 (Tex. 2007)). "Texas applies the transactional test to determine whether a claim could have been raised." *Id.* at 736. "A subsequent suit will be barred if it arises out of the same subject matter of a previous suit

and which through the exercise of diligence, could have been litigated in a prior suit." *Id.* at 737 (quoting *Barr v. Resolution Tr. Corp. ex rel. Sunbelt Fed. Sav.*, 837 S.W.2d 627, 631 (Tex. 1992)).

TCH argues that James's claims against it are barred by res judicata because the second suit against TCH was dismissed with prejudice. The Court agrees. Under Texas res judicata law, the dismissal of James's second state court action qualifies as a final judgment on the merits, satisfying the first element for res judicata. *See Mossler v. Shields*, 818 S.W.2d 752, 754 (Tex. 1991) ("[I]t is well established that a dismissal with prejudice functions as a final determination on the merits."). The second element, identity of parties, is also satisfied because TCH was a party, indeed the only party, to the state court suit. As for the third element, James's current state law claims for fraud and conspiracy to commit fraud "arose out of the same subject matter" as her earlier claims against TCH for defamation and intentional infliction of emotional distress. The same is true of her § 1983 claims against TCH. *See Sims v. City of Madisonville*, 894 F.3d 632, 644–45 (5th Cir. 2018) (holding that a plaintiff's subsequent § 1983 action was barred by res judicata because it arose out of the same set of operative facts as her prior state court lawsuit). All claims against TCH are dismissed with prejudice.

A further issue is whether the preclusive effects of the prior state court judgment extend to any of the other defendants in this case. Only Defendant Stansbury has asserted a res judicata argument. She argues that the preclusive effect extends to the claims against her because she was in "privity" with TCH in virtue of being a TCH employee. It is true that under Texas law, a party in privity with a party to a prior suit may assert res judicata. *E.E.O.C. v. Jefferson Dental Clinics, PA*, 478 F.3d 690, 694 (5th Cir. 2007). However, an employer's relationship to an employee does not itself establish privity. *Hammonds v. Holmes*, 559 S.W.2d 345, 347 (Tex.1977). "A former employee's lawsuit against the employer precludes a subsequent lawsuit against another employee

only if the employer's liability in the prior lawsuit derived vicariously and exclusively from that

other employee." *Sims v. City of Madisonville*, 2015 WL 4040575, at *7 (S.D. Tex. July 1, 2015),

*aff'd*, 894 F.3d 632 (5th Cir. 2018) (citing *Hammonds*, 559 S.W.2d at 347). James's prior state

court action against TCH was not premised on vicarious liability for Stansbury's sole actions. The

same is true of all other individual defendants in this action affiliated with TCH. Thus, the res

judicata effect of James's prior state court suit is confined to TCH alone.

### F.  State Law Claims for Fraud and Conspiracy to Commit Fraud

Although the focus of James's amended complaint is her § 1983 claims, James also brings

state law claims against Defendants for fraud and conspiracy to commit fraud. Only Small, Evans,

and Stansbury—the TCH social worker defendants—have raised arguments specifically targeted

at James's state law claims. They argue that James fails to state a claim for fraud, or conspiracy to

commit fraud. James did not provide a written response to this argument.

"The gist of fraud is successfully using cunning, deception or artifice to cheat another to

the other's injury." *McEwin v. Allstate Texas Lloyds*, 118 S.W.3d 811, 816 (Tex. App.-Amarillo

2003, no pet.). The essential elements of a fraud cause of action are: (1) the defendant made a

material misrepresentation; (2) the defendant knew the representation was false or made the

representation recklessly without any knowledge of its truth; (3) the defendant made the

representation with the intent that the plaintiff would act on that representation or intended to

induce the plaintiff's reliance on the representation; and (4) the plaintiff suffered an injury by

actively and justifiably relying on that representation. *Exxon Corp. v. Emerald Oil & Gas Co.,

L.C.*, 348 S.W.3d 194 (Tex. 2011). Fraud claims must satisfy the heightened pleading standard of

FRCP Rule 9(b), which requires "specificity as to the statements (or omissions) considered to be

fraudulent, the speaker, when and why the statements were made, and an explanation of why they were fraudulent." *Plotkin v. IP Axess Inc.*, 407 F.3d 690, 696 (5th Cir. 2005).

Of the three TCH social worker defendants, James identifies specific alleged material misrepresentations only in relation to Stansbury and Small. Stansbury allegedly included misrepresentations in her medical abuse referral to TDFPS, and Small allegedly misrepresented to TDFPS and Dr. Lye that the child would be in imminent danger if returned to James. However, James does not plead that Small and Stansbury made these statements with the intent that James would act on or rely on the alleged misrepresentations. James's claims for fraud or conspiracy to commit fraud against Evans, Small, or Stansbury are dismissed without prejudice.[4]

### III.   Conclusion

For the above reasons, Defendants' Motions to Dismiss are **GRANTED IN PART** and **DENIED IN PART**, as follows:

James's § 1983 claims against Dr. Louis and Dr. Robertson are **DISMISSED** without prejudice for failure to plead state action. With regard to all other private individual defendants, James has pleaded a sufficient connection to her alleged § 1983 conspiracy to state a plausible claim for state action.

James's § 1983 claims against TDFPS social workers Martin and Smith are **DISMISSED** without prejudice for failure to plead a constitutional violation. Plaintiff has, however, pleaded allegations sufficient to defeat the qualified immunity defense of Ericka Davis in relation to James's alleged violations of her rights under the Fourteenth Amendment.

---

[4] The Court thus does not reach TCH social worker defendants' further argument that James's state law claims are time-barred because they are "health care liability claims" subject to a strict two-year statute of limitations under TEX. CIV. PRAC. & REM. CODE. § 74.001(a)(13).

Dismissal of James's § 1983 claims based on statute of limitations grounds is not appropriate because it is not evident from the face of her pleadings that her claims are time-barred.

All claims against the TDFPS Commissioner, in her official capacity, are **DISMISSED** with prejudice because of the agency's Eleventh Amendment immunity.

All claims against TCH are **DISMISSED** with prejudice because they are barred by the res judicata effect of the dismissal with prejudice in James's second state court lawsuit against TCH. The preclusive effects of that prior judgment do not extend to any other defendant in this case.

James's state law claims against Evans, Stansbury, and Small for fraud and conspiracy to commit fraud are **DISMISSED** without prejudice for failure to state a claim.

**IT IS SO ORDERED.**

**SIGNED** at Houston, Texas, on this the 17th day of June, 2020.

_____

HON. KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE